IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>EDWARD A. LEON,<br><br>Defendant. | Case No.  14-CR-412 (GLS)<br><br>UNITED STATES'<br>SENTENCING MEMORANDUM |

The United States of America, by and through its counsel of record, the United States Attorney for the Northern District of New York, hereby files its sentencing memorandum respectfully requesting that the defendant be sentenced to a term of 120 months' imprisonment, the statutory maximum and the United States Sentencing Guidelines[1] sentence.

## INTRODUCTION

On November 12, 2015, a three-day jury trial culminated in the conviction of the defendant of two counts of making false declarations before a federal grand jury, in violation of 18 U.S.C. § 1623(a).  The trial jury's verdict on each count was supported by overwhelming evidence, including recorded statements by the defendant admitting that the charged declarations he made to a federal grand jury on November 22, 2013 were false, as well as physical proof that his November 22, 2013 declarations were false.  As the trial jury found, the defendant's false declarations were material to a federal grand jury's investigation of a gruesome May 2, 2013 arson at 438 Hulett Street in Schenectady, New York that killed a father, two toddlers, and an infant, and maimed a fourth child.  The defendant is scheduled to be sentenced on Thursday, March 17, 2016, at 9:00 a.m. in Albany, New York.

---

[1] The United States Sentencing Guidelines are hereafter referred to as the "Guidelines" or "U.S.S.G."

## APPLICABLE STATUTORY AND GUIDELINES PROVISIONS

1. **Statutory Maximum Sentences**

Each count of conviction subjects the defendant to a statutory maximum term of five years of imprisonment, a fine of up to $250,000, and a term of supervised release of up to three years.  *See* 18 U.S.C. §§ 1623(a) and 3583(b)(2).  Because Leon was convicted of two counts, he faces an aggregate maximum sentence of imprisonment of ten years' imprisonment, a $500,000 fine, and a term of supervised release of up to five years.

2. **Guidelines Provisions**

   a. **Standard of Proof**

For sentencing guideline determinations, the Second Circuit has consistently held the standard of proof to be preponderance of the evidence, specifically rejecting the clear and convincing standard even for uncharged conduct.  *See, e.g., United States v. Jones*, 531 F.3d 163, 176 (2d Cir. 2008), *United States v. Cordoba-Murgas*, 233 F.3d 704, (2d Cir. 2000), and *United States v. Ruggiero*, 100 F.3d 284, 290 (2d Cir. 1996).  The offense level here results from straightforward application of the plain dictates of the Guideline provision for perjury, U.S.S.G. § 2J1.3, which cross-references to the criminal offense which is the subject of the false testimony (through U.S.S.G. § 2X3.1, "Accessory After the Fact," U.S.S.G. 2K1.4, "Arson," and U.S.S.G. 2A1.1, "First Degree Murder"), with a base offense level cap of 30 (per U.S.S.G. § 2X3.1(a)(3)(B)).  Moreover, it is beyond cavil that the defendant's perjury was "in respect to a criminal offense" which was arson homicide, so the proof on that salient issue meets any standard.

### b.  Criminal History Category

According to the Presentence Investigation Report ("PSIR"), the defendant's criminal history category is I.  PSIR ¶¶ 72, 108.  The United States agrees with the Probation Office's determination of the defendant's criminal history category under the Guidelines.  The defendant's criminal history category, however, does not reflect the defendant's long history of disregard for the law, as detailed in the PSIR.  The "defendant's criminal history category substantially underrepresents the seriousness of the defendant's criminal history," which would warrant an upward departure under U.S.S.G. § 4A1.3(a) if the defendant's guideline imprisonment range was not already set by the statutory maximum.

The defendant's criminal history includes two convictions for acting in a manner injurious to a child less than 17 (in 1995 and 2000); two convictions for disorderly conduct (in 2000 and 2002) in satisfaction of charges of child endangerment; conviction of harassment in 2003; and conviction and a fifteen-day jail sentence for contempt of court in 2005.  PSIR ¶¶ 66-71.  He has been arrested several other times for similar misconduct.  PSIR ¶¶ 73-82.

As outlined in PSIR ¶¶ 83-85, there also is significant evidence of the defendant's involvement with another arson.  On March 17, 2013, the apartment that the defendant had shared with his girlfriend and her children at 9 New Street in St. Johnsville was destroyed by a fire.  Though the initial assessment was that the fire was electrical or the result of accidental ignition of fuel oil in the basement, a subsequent systematic fire scene examination by an ATF Certified Fire Investigator and others yielded a conclusion that the cause of the fire was the introduction of an open flame to combustible materials in the area of the first floor near the stairs that led to the second-floor apartment occupied by the defendant's girlfriend and her children.  ATF laboratory analysis revealed gasoline in wood recovered from that fire scene.  In the

summer of 2012, the defendant was overheard threatening to burn down the house with his girlfriend and the kids in it, if his girlfriend left him.  On the day of the fire or the day before, the defendant was seen approaching 9 New Street on foot carrying a gas can.  The defendant was visiting 9 New Street when the fire occurred.  He helped his girlfriend and her children escape the burning building, and reportedly remarked that he was his girlfriend's hero.

Moreover, there is significant evidence of the defendant's involvement with the arson homicide at 438 Hulett Street in Schenectady on May 2, 2013.  In early 2013, the defendant was living in St. Johnsville, New York with his girlfriend of over four years, but she began seeing David Terry, too, and planned to marry him.  The defendant's reaction to the relationship between Terry and his girlfriend included many threatening communications to them.  The defendant sent his girlfriend texts such as "I will make the devil look like a saint now You should have never brought this side of me out but u just ad now it's my time"; "The devil will learn from me"; "There will b nothing that can stop what is going to happen fun fun fun ha ha ha ha ha lmao lmao lmao;" "Hell will b my playground ha ha ha ha ha ha ha;" and "The gates of hell have opened upon you."  In February of 2013, the defendant used social media to tell Terry that he needed to go someplace and die, and that he knew where Terry lived and would "have fun."  Between April 25, 2013 and April 29, 2013, the defendant used the phone assigned number (518) 258-5593 to send anonymous threatening text messages to numbers associated with Terry, including "you're not going to make it to your wedding day," "die, Dave, die," and "you're a dead man walking."  On April 26, 2013, the defendant left his girlfriend a voicemail telling her to give him David Terry's address so he could take care of this once and for all.  Though the defendant later said that his girlfriend did not provide the address, he said was given the address in response to his threatening texts to David Terry.  On May 2, 2013, the defendant left home a

little after 3:00 a.m., allegedly "to find David Terry" and confront him.  He defendant was in the area of 438 Hulett Street between 4:13 a.m. and 4:21 a.m. and says he saw the fire and left without alerting the occupant or authorities.  The fatal fire was reported about 4:23 am.  Later that day, the defendant was distraught and spoke of killing himself.  For eight months after the fire, the defendant falsely denied both his acquisition and use of the phone assigned number (518) 258-5593 and his presence in the area of 438 Hulett Street at the time of the fire.

### c.  Guidelines Range and Sentence

#### i.  Base Offense Level

The PSIR accurately assigns a Base Offense Level of 30 to Count One and Count Two. PSIR ¶¶ 52-53.  U.S.S.G. § 2J1.3, "Perjury or Subornation of Perjury," sets out a generic base offense level of 14, but has a cross-reference that provides: "If the offense involved perjury, subornation of perjury, or witness bribery in respect to a criminal offense, apply § 2X3.1 (Accessory After the Fact) in respect to that criminal offense, if the resulting offense level is greater than that determined above."  U.S.S.G. § 2J1.3(c)(1).  U.S.S.G. § 2X3.1, "Accessory After the Fact," provides for a base offense level of "6 levels lower than the offense level for the underlying offense," but not more than level 30.  The underlying offense guideline calculation begins with U.S.S.G.§ 2K1.4, "Arson," which also has a cross-reference that provides: "If death resulted . . . apply the most analogous guideline from Chapter Two, Part A (Offenses Against the Person) if the resulting offense level is greater than that determined above." U.S.S.G. § 2K1.4(c)(1).  The "most analogous guideline" is U.S.S.G. § 2A1.1, "First Degree Murder," which applies to both premeditated killing and felony murder and carries a base offense level of 43. After deducting six levels pursuant to U.S.S.G. § 2X3.1, the base offense level is 37.  But because 37 is above the cap of 30 set forth in U.S.S.G. § 2X3.1, the base offense level is 30.

The Second Circuit has endorsed such Guidelines calculations in other perjury cases. *See, e.g.,* *United States v. Suleiman*, 208 F.3d 32, 39 (2d Cir. 2000) (explaining that Accessory After the Fact cross-reference resulted in capped base offense level of 30 and that "[b]y treating a defendant convicted of perjury 'in respect to' a criminal offense as if he were convicted as an accessory after-the-fact to that criminal offense, section 2J1.3(c)(1) increases a defendant's sentence for perjury by roughly the same degree as the degree of seriousness of the criminal offense 'in respect to' which the defendant committed perjury (up to the statutory maximum).").

### ii.  Vulnerable Victims

The PSIR adds two levels under U.S.S.G. § 3A1.1 because of the vulnerable victims of the cross-referenced offense.  PSIR ¶ 55.  Section 3A1.1 provides that, "If the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by 2 levels." Section 3A1.2 applies covers the vulnerable who are victimized by the relevant conduct for which the defendant is accountable. U.S.S.G. § 3A1.1, comment. n.2.

The course of conduct which culminated in the defendant's false declarations before the federal grand jury began not later than April 25, 2013, when the defendant purchased, activated, and began using the phone assigned number (518) 258-5593 to send anonymous threatening text messages to numbers associated with David Terry – including "you're not going to make it to your wedding day," "die, Dave, die," and "you're a dead man walking" – all using "I'm the undertaker" as his signature block.   The defendant explained, under oath, that "I'm the undertaker" "was just a – off name because I wasn't trying to let anybody know it was me."  On January 2, 2014, when the defendant finally admitted that he had gone to Hulett Street on April 26, 2013 to try to find David Terry's house, the defendant said he did not ask anyone for directions because, "I was – just wanted nobody to know I was around."

6

In the early morning hours of May 2, 2013, the defendant drove to the address he had been given, allegedly for the purpose of "trying to find David Terry." The defendant said that, "I kind of figured my best time to actually find where he was where people wouldn't see me around would be in the middle of the night." Gov't Exhs. 37, 37-1.

According to the defendant: (1) he drove to Hulett Street, turned and parked on a side street, and walked back to the intersection of the side street and Hulett Street; (2) while standing on the sidewalk, about 50 to 60 feet from the house at 438 Hulett Street, he saw a small fire in the front porch right by the door, with flames maybe two feet high. The defendant knew that, at that time of day, David Terry and the children would be inside. Yet his concern was only for himself, for ensuring that he not be discovered. As the defendant has repeatedly admitted, when he saw that the house was on fire, he turned around, went back to his van, and "got out of there" as fast as he could – without calling the fire department, the police department, or 911, because he was afraid of how it would look for him.

To continue to conceal his activities, the defendant went not for help, but to work. He encountered people there, spoke with his brother's girlfriend, and met (separately) with his girlfriend's father and a female friend. He did not tell anyone what had happened. The defendant says he did not tell anyone that day or any other day for eight months, until his confession emerged as his false denials yielded, one by one, to the evidence confronting him when Special Agent Maher and Detective Hesch interviewed him on January 2, 2014. During those eight months, the defendant told a series of lies to prevent others from learning of his activities on May 2, 2013.

Within 24 hours of the fatal fire at 438 Hulett Street, a St. Johnsville police officer asked the defendant if he had any involvement with it, and the defendant said "no" and mentioned

7

nothing of his presence outside the house or the fire he saw. On June 19, 2013, Schenectady Police Detective Eric Hesch interviewed the defendant, who said: (1) he never threatened David Terry; and (2) he went from home to Cumberland Farms to Quandt's the morning of May 2, 2013. On November 14, 2013, the defendant told ATF Special Agent Mark Meeks that he went from home to Cumberland Farms to Quandt's the morning of May 2, 2013 and was not in Schenectady, and he repeated that story to Agent Meeks a week later before his grand jury testimony.

On November 22, 2013, the defendant gave the false grand jury testimony for which he was convicted: he testified falsely regarding his travel on May 2, 2013, declaring that he had driven straight from the Cumberland Farms in Palatine Bridge to work at Quandt's in Amsterdam with no stops (Count 1); and he testified falsely in denying that he had used the phone assigned number (518) 258-5593 to send text messages to David Terry and Brianne Frolke, some of which were threatening, from April 25 to 29, 2013 (Count 2). The defendant continued to adhere to those falsehoods after his perjury, including the early parts of his interviews with law enforcement officers on January 2, 2014. When it was explained to him how analysis showed that the phone assigned number (518) 258-5593 was his, he admitted that he did have that phone, but insisted that, "This is – the phones – the only part of it that I lied about." Further questioning led to the defendant's admission that he had indeed been to Schenectady that last week of April to try to find where David Terry lived, but he still insisted, falsely, that he had not been by the house the day of the fire, but had gone straight to work. When Agent Maher questioned that claim, he defendant admitted that he driven through Schenectady and then went to work. But that was not true, as Detective Hesch pointed out, so the defendant then admitted that he parked the van and tried to find the house number, but saw no fire. That was not true

either, as the defendant finally admitted, but insisted the fire was lit when he arrived, he had not set it, and did not know who had.

The defendant's argument that the vulnerable victim enhancement should not be applied because U.S.S.G. § 2X3.1 caps the offense at Level 30 is wrong. The plain language of U.S.S.G. § 2X3.1 provides that the "*base offense* level under this guideline shall not be more than Level 30." (emphasis added). This provision expressly caps the "base offense level" and does not suggest that otherwise applicable enhancements not be applied.

The vulnerable victim enhancement should be applied in this case. First, family members who are traumatized as a result of perjury before a grand jury can be, and, in this case, should be, considered vulnerable victims. For example, in *United States v. Haggard*, 41 F.3d 1320, 1325-26 (9th Cir. 1994), the court rejected the defendant's argument that under Guideline section 3A1.1, family members cannot be considered victims of perjury before the grand jury (and obstruction of justice and making false statements to a federal agency), because such statutes protect the federal government, not private individuals, declaring:

> We decline to read section 3A1.1 so narrowly. We hold that courts properly may look beyond the four corners of the charge to the defendant's underlying conduct in determining whether someone is a "vulnerable victim" under section 3A1.1. By the words of the provision itself, no nexus is required between the identity of the victim and the elements of the crime charged. *See* U.S.S.G. § 3A1.1. Moreover, the Guidelines specifically instruct the district court to take into account in adjusting the defendant's base offense level "all harm" the defendant causes. U.S.S.G. § 1B1.3(a)(3). We conclude that even though the harm Haggard caused Michaela's family members was not an element of any of the crimes of which he was convicted, the district court did not err in considering them "vulnerable victims" for purposes of section 3A1.1.

*See also United States v. Borst*, 62 F.3d 43, 48 (2d Cir. 1995) (endorsing *Haggard* and the proposition that vulnerable victim enhancement is appropriately applied where harm is not an element of any of the crimes of conviction).

Here, like the family members in *Haggard* traumatized by the defendant's false declarations about the location of their relative's body, the survivor of the arson, then five-year old Safyre Terry, and the relatives of those killed in the arson, have been directly victimized by the defendant's false testimony. There can be no question that a maimed child and her relatives are vulnerable in the months after the arson that killed her family. Further, it was plainly foreseeable that, by testifying falsely in an attempt to obfuscate his antagonistic behavior and presence at 438 Hulett Street on May 2, 2013, the defendant would impede the arson investigation, and thereby harm these vulnerable victims by, *inter alia*, depriving them of prompt justice for their loss, and subject them to the emotional trauma of a lengthened criminal investigation.

Second, the Second Circuit has recognized that the vulnerable victim enhancement can be applied even if the vulnerable victim is not a victim of the offense of conviction. *See, e.g., United States v. Echevarria*, 33 F.3d 175, 180-81 (2d Cir. 1994). Here, the defendant's false statements were part of a broader effort to cover his tracks, which included the defendant driving away from a burning house that he knew to contain sleeping children, without alerting authorities or the occupants. It is hard to contemplate victims more vulnerable than the sleeping toddlers and infants the defendant purposefully abandoned as he fled the scene of the arson. The vulnerable victim enhancement "reflect[s] the public interest in more severely punishing those whose choice of victim demonstrates an 'extra measure of criminal depravity.'" *United States v. Hershkowitz*, 968 F.2d 1503, 1505 (2d Cir. 1992). It is difficult to imagine a perjury case with more depraved conduct than occurred here, where a defendant left a sleeping young family to perish when he saw a fire and feared that the circumstances would implicate him. Even if the

10

enhancement under U.S.S.G. § 3A.1 is not applied, the defendant's conduct calls for imprisonment of 120 months.

### iii.  Imprisonment Range

The resulting offense level is 32, which would yield a Guidelines imprisonment range, at criminal history category I, of 121 to 151 months, but is capped at the aggregate statutory maximum of imprisonment for 120 months, which becomes the Guideline sentence pursuant to U.S.S.G. § 5G1.2(d).  Since each count of conviction carries a maximum term of imprisonment for five years, U.S.S.G. § 5G1.2(d) provides that the sentences imposed on each count of conviction shall run consecutively "to the extent necessary to produce a combined sentence equal to the total punishment."

### UNITED STATES' SENTENCING RECOMMENDATION

Based on all of the facts and circumstances, the United States respectfully requests that the Court impose a sentence of imprisonment for 120 months, whether that is the Guidelines sentence, or near the top of, but still within, the Guidelines range for the offenses of conviction.

Although the Guidelines are not mandatory, the Second Circuit has instructed district judges to consider them "faithfully" when sentencing.  *United States v. Crosby*, 397 F.3d 103, 114 (2d Cir. 2005).  As the Supreme Court has explained, "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  *Gall v. United States*, 128 S. Ct. 586, 596 (2007).  "*Booker* did not signal a return to wholly discretionary sentencing."  *United States v. Rattoballi*, 452 F.3d 127, 132 (2d Cir. 2006); *see also Crosby*, 397 F.3d at 113 ("[I]t is important to bear in mind that *Booker/Fanfan* and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge.").  As the Second Circuit has explained, a

"sentencing judge's decision to place special weight on the recommended guideline range will often be appropriate, because the Sentencing Guidelines reflect the considered judgement of the Sentencing Commission, are the only integration of multiple [§ 3553(a)] factors, and, with important exceptions, . . . were based upon the actual sentences of many judges." *Rattoballi*, 452 F.3d at 133; *see also Gall*, 128 S. Ct. at 594 ("[E]ven though the Guidelines are advisory rather than mandatory, they are, as we pointed out in *Rita*, the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions.").

The defendant's criminal conduct was deliberate and blatant, and had significant impact on a federal criminal investigation, and therefore warrants a sentence of 120 months' imprisonment. On November 22, 2013, the defendant testified falsely before a federal grand jury in a flagrant effort to obstruct an ongoing criminal investigation into an incendiary arson fire that resulted in four deaths and maimed a five-year-old girl. The defendant was informed of his rights and knew that the grand jury was investigating that arson at 438 Hulett Street. The defendant obviously knew that his November 22, 2013 testimony was false. He knew he had purchased and used the telephone assigned (518) 258-5593 to send threatening texts, and knew he had gone to Schenectady the morning of May 2, 2013 to find David Terry, and not straight to work in Amsterdam. The questions were clear and basic. The defendant understood them and calculated his answers. As he later explained, he knew that if he had been truthful, people would have thought he set the fire.

The defendant knew well that the identity of the user of "the undertaker" phone was something a grand jury investigating an arson homicide would want to know: who sent the victim messages, within the week before the fire that killed him, saying "You're not going to

make it to your wedding day;" "die, Dave, die;" and "you're a dead man walking." The defendant knew well that a grand jury investigating an arson homicide would want to know that the person who sent those threats, as a scare tactic, angry that his girlfriend might be marrying an occupant, was outside 438 Hulett Street at about the time the fire was set.

The defendant's false grand jury testimony on November 22, 2013 had significant consequences for the investigation, which labored for another year, through an extension of the grand jury term, without an indictment of the person or persons responsible for this arson murder.

The defendant's perjury was intended to, and did, thwart, delay, and hinder that criminal investigation. As the Second Circuit has noted, the Guidelines are intended "to treat more severely perjuries that risk an incomplete or an inaccurate investigation or trial of a criminal offense" and that "as long as the witness has been alerted to the fact that the grand jury is investigating a criminal offense, false answers to material questions will almost always merit enhanced punishment." *Suleiman*, 208 F.3d at 39. The defendant's false answers were designed to cause an incomplete or inaccurate investigation into the arson homicide, by keeping the focus of the investigation on the involvement of others and away from him.

A punishment at the top of the Guidelines is also appropriate to promote respect for the law and reflect the seriousness of the offense. "All perjured relevant testimony is at war with justice, since it may produce a judgment not resting on truth." *In re Mitchell*, 326 U.S. 224, 227 (1945). The defendant's false testimony concerned a crime that is, quite simply, horrific. Sentencing the defendant to a period of incarceration at the top of the Guidelines sends a clear message that perjured testimony is indeed "at war with justice" and will not be treated lightly. The Court has a unique opportunity in this case, which has been widely publicized, to emphasize

that perjury is a serious offense that "undermines the function and province of the law and threatens the integrity of judgments that are the basis of the legal system."  *United States v. Alvarez*, 132 S. Ct. 2537, 2546 (2012) ("testimony under oath has the formality and gravity necessary to remind the witness that his or her statements will be the basis for official government action, action that often affects the rights and liberties of others."); *see also United States v. Markiewicz*, 978 F.2d 786, 802 (2d Cir. 1992) (explaining that the "federal court system itself" is the victim of perjury" and that because perjury laws govern "the relationship between citizens and the federal judicial process" their purpose is "to punish an offender for the 'wrong done to the courts and the administration of justice.'" (quoting *United States v. Manfredonia*, 414 F.2d 760, 764 (2d Cir. 1969).

For these reasons, a sentence to 120 months' imprisonment, would be sufficient, but not greater than necessary, to comply with the specified purposes of sentencing set forth in 18 U.S.C. § 3553(a).

As set forth in Section 3553(a), during sentencing a court must take into consideration, *inter alia*, the "nature and circumstances of the offense," the need for the sentence imposed to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," the need to "protect the public from further crimes of the defendant," the need to "afford adequate deterrence to criminal conduct" and the need to "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."  Consideration of each of those factors calls for the imposition of a sentence at the top of the advisory Guidelines range.

## CONCLUSION

The defendant committed perjury regarding a particularly heinous crime.  He threatened David Terry and others anonymously and went to confront Terry in secret.  He says he did not set the fire set on May 2, 2013 at 438 Hulett Street in Schenectady, but that he saw that fire and fled without alerting anyone so he would not be suspected.  In so doing, he left Terry and three young children to die.  And he lied about what he had done, on May 2nd and for eight more months, including to the federal grand jury.  The defendant's conduct calls for imprisonment for 120 months.

Respectfully submitted this 1st day of March, 2016.

RICHARD S. HARTUNIAN
United States Attorney

By: /s/ *Grant C. Jaquith*
Grant C. Jaquith
First Assistant United States Attorney
Wayne A. Myers
Assistant United States Attorney

15